**Jocelyn FARINA, Plaintiff,**

v.

**COMPUWARE CORPORATION, Defendant.**

**No. CV–98–722–PHX–ROS.**

United States District Court, D. Arizona.

March 31, 2003.

---

Susan Joan Martin, Daniel Lee Bonnett, William Karl Hylen, Jennifer Lynn Kroll, Martin & Bonnett PLLC, Phoenix, AZ, for Plaintiff.

William W. Drury, Jr., James Lawrence Blair, Renaud Cook & Drury PA, Phoenix, AZ, for Defendant.

## ORDER

SILVER, District Judge.

Pending before the Court are three summary judgment motions and one motion for leave to file an amended complaint. On February 8, 2002, Defendant Compu-

ware Corporation ("Defendant" or "Compuware") filed a Motion for Summary Judgment on Title VII Claims (Doc. # 143). On May 17, 2002, the parties each filed motions on Plaintiff Jocelyn Farina's ("Plaintiff" or "Farina") claims under the Family Medical Leave Act ("FMLA"): Plaintiff filed Renewed Motion for Summary Judgment on Count VII of Plaintiff's Second Amended Complaint (Doc. # 167) and Defendant filed Supplemental and Superceding Motion for Summary Judgment on Plaintiff's FMLA Claims (Doc. # 165). In addition, Plaintiff on May 17 filed Motion for Leave to File Third Amended Complaint (Doc. # 168). For reasons explained below, the Court will grant in part and deny in part summary judgment on Plaintiff's Title VII claims, grant summary judgment in favor of Defendants on Plaintiff's FMLA Claims, and deny Plaintiff's Motion for Leave to File a Third Amended Complaint.

## I. Plaintiff's Claims Under Title VII

### A. Factual Background

The following facts are stated in the light most favorable to Plaintiff.[1] On July 8, 1996, Plaintiff began work for Defendant, in the position of Regional Manager for the newly-created Phoenix office. DSOF ¶ 1. At that time, the Phoenix office was one of 22 regional offices in North America. DSOF ¶ 3. Also, all the regional managers were men, except for Plaintiff and Susan Domenici, who was Regional Manager of the Toronto office. PCSOF ¶ 10 Plaintiff's immediate supervisor was Robert Lemley ("Lemley"), who was Director of Western Operations. DSOF ¶ 3.

Plaintiff and Lemley engaged in a series of negotiations regarding Plaintiff's compensation prior to her accepting the position, though each have different characterizations of the understandings reached at that time. PCSOF ¶¶ 5, 6. In September of 1996, Plaintiff received her fiscal year 1997 ("FY97") compensation plan, which covered the period from April 1, 1996 to March 31, 1997. PCSOF ¶ 6. Plaintiff's compensation package included generous provisions for "milestone bonuses," paid to employees when the year's cumulative qualifying sales exceed the regional quota. Under the FY97 compensation plan, these bonuses were not capped, so that each increment of sales above the quota yielded a corresponding bonus. Pl's Opposition at 6.

In March 1997, Plaintiff participated in the successful closing of a transaction involving the sale of certain licenses to American Express (the "Amex transaction" or "Amex deal"), worth about $5.2 million to Defendant. The closing of the transaction came at the end of Defendant's FY97, and was uniquely structured as a so-called "bucket deal," whereby American Express prepaid for the products earlier than actually selecting and receiving the products. PCSOF ¶ 15. As a result of the American Express deal, Plaintiff stood to exceed the FY97 quota for the Phoenix Regional Office handily, resulting in substantial additional compensation for Plaintiff in the form of milestone bonuses. Farina Second Aff. ¶ 16.

Plaintiff, however, never received full credit for the American Express transac-

---

1. Most of the facts on this issue are not in dispute, as evidenced by citations to Defendant's Statement of Facts ("DSOF"). Plaintiff has also filed a Motion to Strike Certain Portions of Defendant's Statement of Facts in Support of Compuware's Motion for Summary Judgment on Title VII Claims [Doc. # 157], concerning a number of factual alle-

gations in Defendant's Statement of Facts. In referencing Defendant's SOF and in granting in part summary judgment on Plaintiff's Title VII claim, the Court has not relied upon statements that Plaintiff moved to strike. Therefore, the Motion to Strike will be denied as moot.

tion towards the calculation of her over-quota milestone bonuses in FY97. Instead, Defendant, in a decision made at least in part by Ron Sleiter ("Sleiter"), then Defendant's Vice–President of its North American Sales Division,[2] decided that the American Express transaction did not qualify for determining milestone bonuses under the terms of the FY97 comp plan. PCSOF ¶¶ 13, 15. That classification proved costly to Plaintiff; she calculated that she was due 21 milestone bonuses for a total of $420,000, while Defendant awarded her only 9 milestone bonuses for a total of $180,000, a difference of $240,000. Farina Second Aff. ¶ 16.

On June 27, 1997, Plaintiff's counsel sent Defendant a letter outlining Plaintiff's opinion that she was owed additional money from her bonuses, and suggesting that Defendant's actions were motivated by sex discrimination in violation of Title VII of the Civil Rights Act of 1964.[3] Exh. 8 to DSOF. Defendant sent a response letter explaining its position on her bonus compensation, and denying any form of sex discrimination, on July 15, 1997. Exh. 9 to DSOF. On July 22, 1997, Plaintiff went on part-time short-term disability leave due to her pregnancy anticipating triplets. PCSOF ¶ 23. Around this time, Plaintiff asserts that she began being "excommunicated" from contact with the office. Pl's

Opposition at 25. In particular, on July 24, 1997, Lemley sent an email to the Phoenix office employees advising them not to contact Plaintiff at home, and informing them that he would run the office long distance from San Francisco.[4] Exh. E to Farina's Second Aff.

On November 19, 1997, Plaintiff filed her first complaint with the Equal Employment Opportunity Commission ("first EEOC complaint"). Exh. 3 to DSOF. Sometime in November, Lemley had a conversation with Terri Trainor Clark ("Clark") about replacing Plaintiff as Phoenix Regional Manager. This conversation may have taken place a short time after Lemley received notice of the EEOC complaint. PCSOF ¶ 77–79. Over the next two months, Lemley recruited and hired Mark Otlweski ("Otlewski") as Phoenix Regional Manager. PCSOF ¶¶ 86, 89.

On February 12, 1998, the EEOC sent Plaintiff a right to sue letter. DSOF ¶ 41. On April 23, 1998, Sleiter sent Plaintiff a letter that confirmed that the Phoenix Regional Manager position had been filled "out of business necessity" and offered her a newly-created position as Sales Manager at a number of locations, none of them in Phoenix. Exh. 16 to PCSOF. On April 24, 1998, Plaintiff initiated this lawsuit against Defendant, alleging disparate treatment under Title VII. DSOF ¶ 44.

**2.** Plaintiff and Defendant have some dispute over whether a "committee" (which included Sleiter) made the decision, or whether Sleiter was solely responsible for compensation decisions, and the extent to which Lemley was involved in the decision. *See* PCSOF ¶ 5, Lemley Depo at 227, Exh 2 to PCSOF. This dispute is irrelevant, however, to resolution of summary judgment.

**3.** Plaintiff contends that this letter is inadmissible under Fed.R.Evid. 408, which precludes "evidence of conduct or statements made in compromise negotiations." However, such evidence is inadmissible only for specified purposes: "to prove liability for or the inval-

idity of the claim or its amount." Plaintiff's letter and Defendant's response are not offered here to show the validity of the underlying Title VII claim, but rather are offered to narrate the course of events and provide context for Plaintiff's later retaliation claim.

**4.** Lemley wrote in part: "Jocelyn has offered to take calls at home if people have questions. I appreciate her willingness to help, but I believe that we should avoid bothering her at home. Please direct all business related calls to me when Jocelyn is not actively at work.... [L]et's help her relax by not bothering her with business issues unless she is in the office." Exh. E to Farina's Second Aff.

Around this time, Plaintiff and Lemley had a series of disputes about whether she received adequate information on the Sales Manager position to make a decision whether to take the job. PCSOF ¶¶ 45–51. On May 15, 1998, Plaintiff sent Defendant a letter indicating both that "I can not [sic] accept the position of Sales Manager" and that "[a]fter [15 days], I will consider myself constructively discharged and will submit my written letter of resignation at that time." Exh. 20 to DSOF. Defendant did not wait for Plaintiff's letter of resignation. On May 19, 1998, Lemley sent Plaintiff a letter, stating that "since you elected to decline our placement offer as a Sales Manager . . . . your employment with Compuware ended effective May 15, 1998." Exh. 21 to DSOF.

On August 14, 1998, Plaintiff filed a second complaint with the EEOC and received a right to sue letter on September 15, 1998. DSOF ¶ 54. On November 3, 1998, she filed her Second Amended Complaint alleging retaliation in violation of Title VII. DSOF ¶ 58

### B. Plaintiff's Disparate Treatment Claims Under Title VII

#### 1. Framework

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Jesinger v. Nev. Fed. Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Jesinger*, 24 F.3d at 1130. In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.1995).

The analysis of a disparate treatment claim under Title VII is governed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *See*

*Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1126 (9th Cir.2001). In order to prevail, the Plaintiff must then show that the employer's purported reason for the adverse employment action is merely a pretext for a discriminatory motive. *Id.*

■ The plaintiff's prima facie case requires a showing that "give[s] rise to an inference of unlawful discrimination." *Id.* (quoting *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The prima facie case may be based either on direct evidence of discriminatory intent or on a presumption arising from several factors. The plaintiff must show that she: (1) is a member of a protected class; (2) performed according to the employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than other employees similarly situated. *Chuang v. University of California, Davis, Bd. of Trustees*, 225 F.3d 1115, 1123 (9th Cir.2000); *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Finally, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir.1994).

■ "Once a prima facie case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis*, 26 F.3d at 889. The burden then shifts back to the plaintiff to show that the employer's stated reason is a pretext. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir.1998). At the pretext stage, "[w]hen the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221.

However, where plaintiff relies on indirect evidence to show that the defendant's stated motive is not the actual motive, "[s]uch evidence ... must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex." *Id.* at 1222.

### 2. Analysis

Plaintiff asserts three ways in which she was subject to disparate treatment. First, her male counterparts who worked on the Amex transaction received credit for 100% of the value of the Amex deal when calculating milestone bonuses, while she received credit for less than 100%. Second, some male regional managers received credit for "capacity" and "additional" license sales when calculating milestone bonuses, though Plaintiff did not receive credit for the portions of the Amex transaction that were classified as "additional" and/or "capacity" sales. Third, the sales goals of the Phoenix region were increased 135% from FY97 to FY98, but the sales goals for regions headed by male Regional Managers were increased only 48% from FY97 to FY98, a change that would impact Plaintiff's potential bonus compensation in FY98. Pl's Opposition at 3–4. Plaintiff's first two claims are that the formula used to calculate her FY97 bonus was different than the formula used for male managers. Plaintiff's final claim is that Defendant sought to prospectively limit her FY98 bonus by increasing the Phoenix sales quota disproportionately when compared to those in other regions.

#### (1) Classification of the Amex Transaction

■ Plaintiff provides no direct evidence that she was subject to discrimination in the award of FY97 'bonuses', but she presents circumstantial evidence that

her FY97 bonus was calculated differently than the FY97 bonuses of Defendant's male employees.[5] Plaintiff clearly establishes the first three *McDonnell Douglas* requirements of proving discrimination through indirect evidence. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. First, as a woman, she is a member of a protected class. Second, she performed her job in accordance with her employer's expectation, a fact not in dispute. Third, Plaintiff contends that the failure to receive twelve milestone bonuses for a total of $240,000 due under her FY97 compensation plan was an adverse employment action. As for the fourth prong, Plaintiff contends that a different formula for computing milestone bonuses was used for similarly situated male employees. *See Chuang*, 225 F.3d at 1123.

Plaintiff presents specific and substantial evidence that she was treated differently from her similarly situated male counterparts in the calculation of FY97 bonuses. She provides evidence that she was treated differently from her male colleagues regarding classifying the Amex transaction, and from similarly situated male employees regarding credit for similar transactions. Defendant's primary argument is that Plaintiff was not treated differently, but Defendant fails to refute Plaintiff's evidence of a prima facie case on summary judgment. Defendant then fails to articulate a legitimate, non-discriminatory reason for the differential treatment. Although Defendant claims that it was under no obligation to award Plaintiff additional milestone bonuses, it nevertheless fails to explain why Plaintiff was treated differently from her male counterparts when Defendant exercised discretion in calculating bonuses.

Plaintiff's first argument in setting forth a prima facie case is that the Amex transaction was inconsistently classified, such that her male supervisors received 100% credit for the value of the transaction toward milestone bonuses, while she received credit for less than 100% of the value. Lemley himself testified that his own bonus compensation was based on receiving 100% credit for the Amex transaction. Lemley Depo at 285, 287, Exh. 2 to PCSOF.[6] In addition Lemley testified that a portion of Plaintiff's bonus compensation was directly related to the closing of the Amex deal, yet Plaintiff did not get full credit in the bonus calculation. Lemley Depo at 285. Furthermore, Plaintiff offers evidence that another employee, Tom Chalk, an "enterprise sales manager," received full credit for the Amex transaction. *See* Sleiter Depo at 110–111, Exh. 3 to PCSOF. Plaintiff contends, and Defendant does not dispute, that the application of "new," "additional," and "capacity" sales to calculating milestone bonuses should

---

**5.** Plaintiff identifies a few gender-specific comments that were made to her when she was interviewing for the position, though she does not explicitly rely on them to establish direct evidence of discrimination. *See* Farina Second Aff. ¶ 11. The questions about child care arrangements and working as a mother are neutral in context and do not show evidence of discrimination. *See Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1439 (9th Cir.1990) (stray remarks insufficient to establish discrimination). One comment made by an employee, Wes Peterson, that there were few women in upper management because Defendant could not find any qualified women, is also no more than a stray remark, and indeed, not relied upon by Plaintiff in establishing her case. Any relevance is diminished by the fact that Peterson made none of the decisions at issue, and Plaintiff's qualifications were not criticized by Defendant.

**6.** Lemley gave the following testimony: "I'd have to go back and review it, but I believe that my compensation was based upon value of the—I believe it was based on the full value of the deal.

Q: The full 5.2 million?

A: I believe so."

Lemley Depo at 285.

have been similar under Lemley's and Chalk's compensation plans as under Plaintiff's. PCSOF ¶¶ 7, 110, 111, Exh. 11, 12 to PCSOF.[7] The three employees were similarly situated, yet were treated differently when the bonuses were calculated based on the Amex transaction.

Plaintiff's second argument is that male Regional Managers received bonuses based on full credit for similar transactions, because Defendant gave male managers, but not Plaintiff, credit for "additional" and "capacity" sales in calculating milestone bonuses. Farina Second Aff. ¶ 16, 17. Defendant maintains that the Amex transaction did not involve the sale of "new" products, so therefore. Defendant, by the terms of Plaintiff's FY97 Compensation Plan, was not required to credit Plaintiff with the transaction in calculating bonuses. Instead, Defendant contends that the Amex transaction was classified partly as "new," partly as "additional" sales, and partly as "capacity" sales. Farina Second Aff. ¶ 16, Exh. B.[8] However, Plaintiff offers evidence that male managers received credit for "additional" or "capacity" sales toward calculation of their milestone bonuses in FY97. In particular, Bruce Davis, San Francisco Regional Manager, acknowledged that he received 100% credit for transactions involving Wells Fargo and Pacific Bell, though they were classified as "additional" and "capacity" sales. Farina Aff. ¶ 16, Exh. C, D; Davis Depo. at 52–54, Exh. 8 to PCSOF.[9] Plaintiff produces similar evidence for at least three other male Regional Managers, Kris Manery, Bob Trojan, and Ed Mott. Farina Aff. Exh. C, D. Therefore, Plaintiff provides enough evidence to establish a prima facie case of discrimination.

█ In response to Plaintiff's prima facie evidence of disparate treatment, Defendant repeatedly denies that Plaintiff was treated differently. In particular, Defendant points out that Plaintiff was the "highest paid Regional Manager at Compuware for that fiscal year [FY97]." Def's Mot. for Summ. Judg. at 6. This argument misapprehends Plaintiff's disparate treatment claim. Farina alleges that the *formula* for computing bonuses was inconsistent, with men receiving more favorable treatment in the calculation of bonuses.

7. Lemley's compensation plan, Exh. 11 to PCSOF, at 1, specifies "new license sales" as a basis for bonus calculation. In contrast, Chalk's compensation plan, Exh. 12 to PCSOF at 4, is based on "new licensed sales/additional licensed sales/capacity licensed sales." Chalk's compensation plan, on face, calculates bonuses based on different criteria from that of Plaintiff's. Arguably, Chalk is not "similarly situated" to Plaintiff because it would not be inconsistent to award Chalk a higher bonus based solely on his compensation plan, a fact which undercuts Plaintiff's disparate treatment claim to the extent that the use of different criteria is justifiable. However, Defendant does not argue this particular point, and Plaintiff puts forth enough evidence of disparate treatment relative to Lemley's bonus plan to survive summary judgment.

8. At oral argument, Defendant argued that the Amex transaction should not have been classified as "new,", and that Defendant's previous designation of the transaction as being partially "new" was the result of "clerical errors." *See* Transcript at 30–32.

Plaintiff argues, and Defendant strongly disputes, that the Amex transaction *should have been* classified as a sale of a "new license." *See* DSOF ¶ 14. This dispute is most relevant to Plaintiff's contract claims, which remain pending notwithstanding the resolution of the summary judgment motion. It is not necessary for the Court to resolve whether Plaintiff was actually due the bonuses within the terms of the contract. The relevant question under Title VII is whether Plaintiff was treated *differently* from her male counterparts in terms of classifying the transaction.

9. Davis testified, in part, "It would appear that I was paid [bonuses] on additional licenses, and they were treated as new." Davis Depo at 54, Exh. 8 to PCSOF.

Because of the large value of the Amex transaction, Plaintiff did receive substantial compensation for FY97. However, there is sufficient evidence for a jury to conclude that Defendant applied a different and less favorable formula in calculating Plaintiff's bonus than was applied to similarly situated men, and that the formula adversely affected her bonus compensation.

Defendant's principal non-discriminatory explanation for Plaintiff's bonus calculation is that Defendant had complete discretion to not award bonuses for the Amex transaction by the terms of Plaintiff's FY97 Compensation Plan. Defendant contends that the Amex transaction did not involve sales of "new" licenses, and points out that Plaintiff's FY97 Compensation Plan granted Sleiter discretion in awarding bonuses when sales did not involve "new" products. Def's Reply at 3, DSOF ¶¶ 12–15. This justification is insufficient to refute Plaintiff's prima facie case because it does not offer objective neutral criteria to explain why male employees were treated *more favorably* under the exercise of Defendant's discretion. The fact that Sleiter had unbridled discretion to award bonuses does not permit the discriminatory exercise of his discretion. To the extent that Defendant relies on the distinction between "new," "additional," and "capacity" sales, Plaintiff presents enough comparative evidence to show that those categories were inconsistently applied between males and Plaintiff.

At oral argument, Defendant presented a more nuanced explanation of Sleiter's formula for bonus calculation, which De-

fendant claims was objective and consistently applied. According to Defendant, Sleiter credited managers for "new" business under the compensation plans, then made three "exceptions" to the general rule that managers were not compensated for business that was not "new." Transcript of Jan. 10, 2003 Hearing ("Transcript") at 10. First, he credited managers for "flow" business (defined as a transaction under $500,000), whether or not the "flow" business was classified as "additional" or "capacity" sales. Transcript at 10, Sleiter Depo at 54–6. Second, he rounded up in the calculation of milestone bonuses, giving managers full credit for milestones they had only partially earned.[10] Transcript at 11, Sleiter Depo at 57. Third, he gave managers 50% credit for any large transactions, but gave this credit only once they had met their quota. Transcript at 11–12, Sleiter Depo at 57–8. Therefore, according to Defendant, "What [Sleiter] did for Ms. Farina was apply her American Express transaction to get her to her quota, and then he gave her the difference at 50 percent, just like he did everyone else." Transcript at 12. Defendant denies that anyone, including Lemley, received full credit for the Amex transaction, and asserts that Sleiter applied this formula to all regional managers. *See* Transcript at 14–18.

Defendant's proffered explanation is not sufficient. First, Sleiter's calculation was still an exercise of his discretion; he created "exceptions" in his calculation of milestone bonuses that were not based on established written policy nor recorded at the time of the alleged calculation.[11] Sec-

---

**10.** In other words, if a manager was at 2.8 milestone bonuses, Sleiter would round up to 3, and pay the milestone bonuses as if the manager had reached 3. Transcript at 11.

**11.** Defendant conceded this point at oral argument: "Now did [Sleiter] say, 'There is a

formula where I say ABC?' No. What he said to us in his deposition was ... 'all of the transactions don't involve new business, so *I decided* that I would compensate them over and above what they were entitled to under their fiscal year comp plans with three exceptions.'" Transcript at 29 (emphasis added).

ond, Plaintiff presents evidence that Sleiter did not apply this formula to all managers consistently. In fact, Sleiter was unable to explain in his deposition how this formula was applied in particular cases. When explaining how he calculated Davis' bonus, he conceded that "I'm speculating here again" and was unable to reconcile his memory of the calculations with documents of bonus payouts that Defendant generated to aid his testimony. Sleiter Depo at 86, 90–91. In one instance, he was specifically unable to explain why Davis was paid two milestone bonuses in one month, even while applying his own methodology. Sleiter Depo at 97–8.[12] These inconsistencies create a genuine issue of material fact. *See Chuang*, 225 F.3d at 1127("[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting the prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Further, Sleiter's deposition testimony contradicts the testimony of both Lemley and Davis, who testified that they were paid milestone bonuses on transactions in a manner inconsistent with Sleiter's formula. Whether or not they were in the best position to determine the calculation of their own bonuses, their testimony creates a genuine issue of material fact because it creates a credibility issue. Additionally, Plaintiff herself submitted an Affidavit explaining the inconsistency of Sleiter's calculations. Based on documents produced by Defendant, Plaintiff submitted a detailed breakdown of how other Regional Managers were credited with "additional" and "capacity" sales toward their milestone bonuses. *See* Farina Second Aff. ¶¶ 17, 21, Exh. D. Plaintiff's analysis is admissible as the opinion testimony of a lay witness under Fed.R.Evid. 701; she has a unique familiarity with the record-keeping and business operations of Defendant and had personal knowledge of the documents upon which she relies for her calculations.[13] *See* Transcript at 42, 47–8 (outlining Plaintiff's qualifications). *See*

---

12. "Q: Now, doesn't even get him to one milestone [in January], does it?

A: That is correct.

Q: So how was he paid for two milestones in January is what I'm trying to figure out.

A: I think he wasn't paid until March if you look at it.

Q: Well, he was booked as earned, if I'm reading this correctly, booked as earned two milestones $40,000, January 26, 1997?

A: Yeah, I see that. I'm not—I can't answer it. I can answer it as to if he again went with the 129—I don't know what the—

Q: You don't know?

A: No."
Sleiter Depo at 97–8.

13. At oral argument, Defendant contended that Plaintiff's testimony was inadmissible be-cause her calculations would be mere "speculation." Transcript at 36. Defendant's position is that only the person who performed the bonus calculations, Sleiter, has the knowledge to testify about whether the calculations make sense. Defendant misapprehends the purpose of Plaintiff's testimony to the extent her testimony is admissible under Fed.R.Evid. 701. Plaintiff does not claim she has knowledge about Sleiter's personal decision-making; rather, she has applied her familiarity with Defendant's records and operations to offer opinion testimony about whether Sleiter could have reached his final decisions by relying on a single, consistent formula. Merely branding such Rule 701 testimony "speculative," without further elaboration, is insufficient to exclude it from the Court's consideration. Defendant has not rebutted Plaintiff's specific calculations.

also *Mississippi Chemical Corp. v. Dresser–Rand Co.,* 287 F.3d 359, 373–4 (5th Cir.2002) (allowing Rule 701 testimony of lost profits by employee familiar with employer's books); *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1175 (3d Cir. 1993) (allowing Rule 701 testimony of projected lost profits by employee familiar with day-to-day affairs of business, even if partially relying on documents prepared by others).

Plaintiff has presented specific and substantial evidence that she was treated differently from her male counterparts in the calculations of bonuses, such that a jury could find that she was discriminated against on account of her gender.

### (2) Regional sales objectives for FY98

██ Plaintiff contends that sales quotas for the Phoenix Region were disproportionately increased from FY97 to FY98 because the region was managed by a woman. Both parties agree that the sales quotas for *all* regions were raised from FY97 to FY98, but Plaintiff claims that the rise in the Phoenix Region was much higher than that of other regions. The raise in sales quotas directly impacted Plaintiff's potential compensation, because her bonuses were calculated based on the amount she exceeded the sales quota for her region. Again, Plaintiff has no direct evidence of discrimination in regards to Defendant's decision to set sales quotas for FY98, but offers indirect evidence.

Initially, Plaintiff has not offered sufficient evidence that the Phoenix Region was actually treated less favorably. The parties differ regarding the percentage increase in the Phoenix Region's sales quota from FY97 to FY98. Plaintiff claims that the average increase for all regions other than Phoenix was 48%, while the percentage increase for Phoenix was 135%. Pl's Opposition at 24. Defendant indicates that the increase in the Phoenix region was only 76.1%, below the percentage increases for the San Francisco region, and not far out of line with some other regions. Exh. 10B to DSOF. Defendant's numbers are more relevant, because Plaintiff uses her personal quota as the FY97 baseline, though her personal quota was lower than the FY97 regional quota in accordance with an agreement made during her hiring. *See* Farina Depo at 118–19, Sleiter Depo at 41–2. In FY98, her personal quota was the same as the regional quota, so her calculation using the baseline of her personal FY97 quota is not an accurate indicator of the change in *the region's* sales quota. Either way, the minimal statistical evidence is inconclusive. The newly-created Phoenix region had one of the lowest sales goals of any region in FY97. Exh. 10B to DSOF. Plaintiff might expect the sales quota to grow in FY98 at a higher proportional rate merely because the goal began so low.[14]

Further, Plaintiff's prima facie case fails because she does not show that other Regional Managers were similarly situated. Because the sales quota affected regions rather than Regional Managers directly, Plaintiff must show that the regions were similarly situated, such that the sales quota changes *should* be similar. For example, the Phoenix Region was newly established in 1997, and might be anticipated to grow at a different rate than more established regions. Plaintiff bears the burden of showing why a comparison to the FY97–FY98 changes in established regions would be relevant, rather than a comparison to

---

**14.** In absolute dollar values, the Phoenix increase from FY97 to FY98 was sixth out of the 22 regions, and just barely above the increase for two other regions, Boston and Toronto.

Exh. 10B to DSOF. While this statistic is not conclusive, it also illustrates the difficulty of comparing amongst regions that were not comparatively situated in FY97.

the early growth curve of newly established regions. Plaintiff thus fails to establish the fourth element of her prima facie case.

 Even if she could make a prima facie case, however, Defendant meets its burden under the second prong of *McDonnell Douglas*. As a legitimate, non-discriminatory reason, Defendant contends that it was justified in increasing the quota for the Phoenix regional office for purely business reasons. Lisa Girolami, a systems analyst who helped Sleiter formulate the FY98 sales quotas, testified to a significant list of business factors that were used in setting the quota, including new hires, turnover, historical sales productivity, and the introduction of new products. *See* Girolami Depo at 15–17, Exh. 11B to DSOF. The increase in the FY98 sales quota for the Phoenix region was consistent with a variation in quota increases among different regions: for example, a 96.1% increase for San Francisco (managed by a male) and a 64.1% increase for Toronto (managed by a woman). Moreover, the yearly sales quota served a variety of purposes besides setting the benchmark for Plaintiff's bonus; unlike the direct calculation of Plaintiff's FY97 bonus, Defendant can credibly refute the claim that the Region-wide FY98 sales quota was gender-biased against Plaintiff in particular.

Plaintiff's evidence in support of her prima facie case is not sufficient to refute Defendant's proffered explanation. "[C]ircumstantial evidence that tends to show that the employer's proffered motives were not the actual motives must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex." *Blue v. Widnall*, 162 F.3d 541, 546 (9th Cir.1998) (*quoting Godwin*, 150 F.3d at 1220–21). "[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment

is appropriate even though plaintiff has established a minimal prima facie case...." *Wallis*, 26 F.3d at 890–91. Plaintiff's evidence on the calculation of sales quotas for FY98 is neither specific nor substantial. She fails to establish that the FY98 regional sales quota had anything to do with her status as a woman, rather than the business objectives of Defendant.

### C. Plaintiff's Retaliation Claims Under Title VII

#### 1. Framework

 A retaliation claim under Title VII is governed by the same *McDonnell Douglas* framework applicable to disparate treatment claims. *See Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir.1988). Accordingly, a plaintiff must first establish a prima facie case, then the burden shifts to the defendant to offer a nondiscriminatory reason for the adverse treatment. The plaintiff must then provide evidence to show that the defendant's stated reason is a pretext. The plaintiff's prima facie case requires a showing "that she engaged in a protected activity, that she was thereafter subjected by her employer to adverse employment action, and that a causal link exists between the two." *Id.; see also Wallis*, 26 F.3d at 891. An "adverse employment action" is "adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir.2000) (quoting EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)).

#### 2. Analysis

Plaintiff alleges five ways in which Defendant retaliated against her because she filed Title VII complaints: (1) disproportionally increasing the sales objectives of

the Phoenix Region in FY98 (as discussed above under disparate treatment); (2) altering her compensation plan for FY98 to limit her bonus potential; (3) taking steps to replace Plaintiff as Regional Manager, and eventually permanently replacing her while she was on leave; (4) attempting to demote Plaintiff to Sales Manager and refusing to provide her with sufficient information to make an informed decision regarding the position; and (5) terminating Plaintiff's employment effective May 15, 1998. Pl's Opposition at 4–5. The parties do not dispute that Plaintiff's filing of a complaint with the EEOC constituted a "protected activity." Also, the parties do not dispute that each of Plaintiff's five allegations of retaliation would constitute "adverse actions" under Title VII.

*(1) Regional sales objectives for FY98*

■ As discussed under Section I.B.2 above, Farina cannot make out a claim that the regional sales objectives for FY98 constituted discrimination or retaliation. Because the timing of the release of FY98 sales objectives closely followed Farina's discrimination claims, she has some argument that the two events are causally connected.

However, as discussed above, Plaintiff cannot prove that the Phoenix Region was singled out for discriminatory treatment. Moreover, even if she could provide some evidence, Defendant's legitimate business reasons for increasing the quota are sufficient to rebut her prima facie case. Plaintiff provides no further evidence that the change in quota was a pretext for her retaliation claim.

*(2) Bonus caps under the FY98 compensation plan*

■ Plaintiff contends that the caps on bonuses implemented in the FY98 compensation plan constituted retaliation for her EEOC claim. Initially, Plaintiff claims that Defendant was obligated to allow her

unlimited bonus potential by an agreement reached between Plaintiff and Lemley before she was hired. Plaintiff asserts that she and Lemley agreed that her subsequent compensation plans would follow the outline of the FY96 compensation plan, which did not contain bonus caps. PCSOF ¶ 9. Lemley claims otherwise, and therefore this issue is one of witness credibility to be determined by a jury. While Lemley's alleged promises are integral to Plaintiff's contract claims, they are not sufficient to prove Plaintiff's retaliation claim, which requires Plaintiff to show that the bonus cap was connected to her protected activity. *See Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982) (plaintiff must present evidence sufficient to raise an inference that protected activity was the "likely reason" for adverse action). To show a connection, Plaintiff relies on the timing of the release of the FY98 compensation plan, and that bonus compensation was at the center of her Title VII complaint.

In rebuttal, Defendant points out that all FY98 compensation plans contained a cap on bonuses, a fact which Plaintiff concedes. Farina Depo at 252, 448; PCSOF ¶ 27. Therefore, Defendant argues that the cap was not directed at Plaintiff, and could not have been connected to her Title VII complaint. Plaintiff presents no evidence to show that this explanation is pretextual. Moreover, she provides no evidence that the prospective cap on bonuses would affect her more than other employees. While the cap would have impacted Plaintiff had it been in place in FY97 or applied retroactively, its impact on her potential bonus in FY98 is purely speculative. The cap would only have limited Plaintiff's FY97 bonus in regards to the uniquely large Amex transaction, yet Plaintiff does not indicate she anticipated arranging any such large transaction in FY98. In fact, the cap could just have easily served to limit

the bonus of a male employee the following year as limiting Plaintiff's bonus. Plaintiff has no evidence of pretext to survive summary judgment.

### (3) Replacement and Demotion

Plaintiff argues that Defendant retaliated against her by permanently replacing her as Regional Manager in December 1997, and then offering her a new Sales Manager position instead of her old Regional Manager position when she prepared to return to work in April 1998. Plaintiff makes these claims separately, though they are interrelated, because Plaintiff's permanent replacement led to the eventual offer of the Sales Manager position. The fact that Farina was permanently replaced may be independently actionable, because "lateral transfers" may constitute adverse employment actions if reasonably likely to deter a party from engaging in protected activity. *See Ray,* 217 F.3d at 1242–3. Additionally, Plaintiff can show she was demoted if she can prove that the Sales Manager position was an inferior position to the Regional Manager position.

Plaintiff presents sufficient evidence to show that Defendant took steps to replace her within days or weeks of Plaintiff filing her first EEOC complaint. Defendant argues that Lemley and Plaintiff had at least one conversation about replacing Plaintiff sometime in November 1997 before the

first EEOC complaint.[15] Def's Reply at 5. However, Defendant does not point the Court to any evidence conclusively indicating that a decision about replacement was made before the first EEOC complaint.[16] On the contrary, Terri Trainor Clark ("Clark"), a human resources manager working for Defendant, testified that Lemley informed her that he learned of Plaintiff's EEOC complaint in mid-November, shortly after Lemley felt he had "a very pleasant conversation" with Plaintiff. Clark Depo at 54, Exh. 6 to PCSOF. Clark further testified that Lemley had a conversation with her about replacing Plaintiff in December of 1997. Clark Depo at 35. Finally, Clark testified that Lemley told her in December that Plaintiff was probably not coming back to work because of the birth of her triplets, *id.,* though Plaintiff denies telling Lemley any such thing.

Otlewski's testimony corroborates the assertion that Plaintiff was replaced after filing her complaint. Otlewski testified that he heard through the "corporate grapevine" that Plaintiff might not return from leave and the Phoenix Regional Manager position would be open.[17] He indicated that he contacted Lemley about the position in November or December of 1997. Otlewski Depo at 41–43, Exh. 7 to PCSOF. Otlewski was informed that he would be hired in mid-December of 1997. *Id.* at 61. Therefore, there is sufficient

---

**15.** This claim is supported by the Plaintiff's actual EEOC complaint, in which she wrote, "I was recently advised by my employer that my job as Regional Manager is not guaranteed and will most likely not be available for me when I return from medical leave " Exh. 3 to DSOF.

**16.** At some point in time, Lemley and Plaintiff had conversations about her replacement in which Plaintiff indicated that she "understood" some of Lemley's decisions in her absence. Defendant contends that Plaintiff implied that she understood the business

reasons for her replacement, while Plaintiff explains that an understanding does not equate with consenting to being replaced on a permanent basis and never accepted Lemley's decisions. DSOF ¶ 62, PCSOF¶ 62. The dispute turns on credibility of witness, and therefore should be decided by a jury.

**17.** Otlewski's testimony of what he heard through the "corporate grapevine" is admissible if offered to determine Otlewski's state of mind in late 1997, rather than the truth of the matter asserted, and therefore is not hearsay. Fed.R.Evid. 801(c).

evidence for a jury to find that Lemley took steps to replace Farina shortly after receiving notice of her first EEOC complaint, which establishes a prima facie case of retaliation.

 Defendant offers "business necessity" as a non-discriminatory justification for replacing Farina as Phoenix Regional Manager. Sleiter, in fact, provided this justification to Plaintiff in his April 23, 1998 letter offering her a Sales Manager position. Exh. 16 to PCSOF. Defendant's argument is that the performance of the Phoenix regional office was suffering without an on-site manager, because Lemley was attempting to supervise the office remotely from San Francisco. Therefore, Defendant needed to hire a permanent replacement to improve business at the faltering office.

"Business necessity," however, is not a sufficient justification for Defendant's efforts to hire a *permanent* replacement. Viewing the facts in Plaintiff's favor, Plaintiff presents evidence that at least one other regional manager position was filled on a temporary or stand-in basis while the manager was on leave. PCSOF ¶ 107, Slack Depo. at 23–26, Exh. 10 to PCSOF. While Plaintiff provides no instance that is exactly analogous to her length of leave, Defendant has not offered evidence that any alternative arrangements for a temporary replacement were explored. Second, Lemley effectively cut off contact between Plaintiff and employees in the Phoenix Regional Office while she was bed-ridden, a move which arguably exacerbated the effect of not having an on-site manager. Third, Defendant took steps to hire Otlewski as a permanent replacement, without first offering him a temporary position. When Plaintiff prepared to return to work, Defendant offered Plaintiff, not Otlewski, the position of Sales Manager in a different city. Defendant argues that it hoped to keep Otlewski in his job "because the performance of the office was beginning to improve with a new Regional Manager on site." Def's Motion at 18. However, Defendant's evidence only indicates that the office suffered without *any* on-site manager. Defendant makes no argument that Otlewski was better qualified or more competent for the job than Plaintiff. This evidence tends to show that Defendant's justification of "business necessity" is pretextual. Combined with the evidence of timing in Lemley's actions to replace Plaintiff soon after her EEOC complaint, the Court finds that Plaintiff has presented sufficient evidence to survive summary judgment on the retaliation claims of replacement and demotion.[18]

 Defendant's final argument is that the filing of the EEOC complaint and the demotion and firing are too attenuated to be cognizable as a retaliation claim. Defendant's argument is misplaced because a fact-finder need not rely only on the timing to infer retaliatory motive. The jury could rely on the fact that the alleged decision-makers, particularly Lemley, were aware of Plaintiff's complaint and were implicat-

---

18. Plaintiff also asserts that Defendant failed to provide her with specific information, including estimates of sales quotas, that would allow her to calculate her earning potential in the Sales Manager job. Defendant's failure to provide information is not itself actionable as a retaliatory measure. Defendant indicated to Plaintiff at the time, and continues to assert, that the information Plaintiff requested on the Sales Manager position was simply unavailable. In response, Plaintiff admits that she is unable to prove that Defendant either had the information available or provided it to any other employees. See Farina Depo at 13–14, 247, 493–4. Given this lack of evidence, Plaintiff cannot show that Defendant's stated reasons are pretextual. While a jury might consider the lack of information relevant to the demotion or termination claims, the lack of information itself cannot form the basis of a Title VII retaliation claim.

ed in the complaint. *See Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 505 (9th Cir.1989) (jury can infer retaliatory motive from actions of management personnel who knew of plaintiff's EEOC complaint, had prompted the complaint, and later made adverse employment decision). Also, the intervening conduct of Lemley in reallocating Plaintiff's job responsibilities is sufficient to establish that the complaint could be a "likely reason" for the adverse action. *Cohen,* 686 F.2d at 796. *See O'Neal v. Ferguson Construction Co.,* 237 F.3d 1248, 1253 (10th Cir.2001) ("The jury could have inferred from this evidence that the reallocation of responsibilities soon after the filing of the EEOC claim was a precursor to the ultimate reduction in [plaintiff's] hours, thus providing the causal connection between the EEOC filing and the adverse employment action."). *See also Ray,* 217 F.3d at 1244 (employer's actions to decrease employee's "ability to influence workplace policy" constitute adverse actions). While an extended lapse of time may not be sufficient to prove a causal connection, the lapse of time does not, by itself, defeat a retaliation claim if a Plaintiff can provide further evidence of causation. *See Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1065 (9th Cir. 2002), *O'Neal,* 237 F.3d at 1253. Plaintiff presents sufficient evidence in addition to the timing to survive summary judgment.

*(4) Firing*

█ Finally, Plaintiff argues that her termination was an adverse employment action constituting retaliation. Defendant's first argument in response is that Plaintiff was not terminated, but that she resigned in her May 15, 1998 letter. Plaintiff's May 15 letter to Defendant stated both that "I can not [sic] accept the position of Sales Manager" and that "[a]fter [15 days], I will consider myself constructively discharged and will submit my written letter of resignation at that time."

Exh. 20 to DSOF. Defendant treated Plaintiff's letter as an immediate resignation because she turned down the Sales Manager position, and informed her on May 19, 1998 that her "employment ended effective May 15, 1998." Exh. 21 to DSOF.

Plaintiff presents genuine issues of fact that she did not actually resign on May 15, but was terminated on May 19. Plaintiff's letter can be interpreted as stating her position that she construed Defendant's actions as constructive discharge, but that she did not intend to resign. Plaintiff's letter would arguably comply with the fifteen-day notice requirement of Arizona's constructive discharge statute, A.R.S. § 23–1502, which provides that constructive discharge can be established by "[e]vidence of objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign, if the employer has been given at least fifteen days' notice by the employee that the employee intends to resign because of these conditions and employer fails to respond to the employee's concerns." A.R.S. § 23–1502(A)(1). Therefore, Plaintiff has presented sufficient evidence that her May 15 letter was not intended as a resignation, and Defendant did indeed terminate her employment on May 19.

For reasons analogous to her demotion claim, Plaintiff has made a prima facie case that she was terminated in retaliation for her EEOC complaint. The termination was part of a chain of events originating with Defendant's decision to permanently replace Plaintiff. Although Plaintiff's termination occurred months after the EEOC complaint, the timing was in part a function of Plaintiff's unusually extended medical leave of absence. At the first opportunity for Plaintiff to return from approved medical leave, she was allegedly demoted

and terminated. Indeed, Plaintiff's and Lemley's correspondence before her alleged termination focused on disputes about her replacement as Regional Manager and whether she would be returned to work in an equivalent job position.

Defendant's only proffered non-discriminatory reason for the termination is that it interpreted the May 15 letter as a resignation, but this interpretation is far from conclusive and Plaintiff offers evidence that such a reason was pretextual. The letter is ambiguous enough to be read either way. In the meantime, Defendant took steps to permanently replace and allegedly demote Plaintiff in the weeks and months before the termination. Plaintiff's May 15 letter gives notice to Defendant that Defendant's prior actions might form the basis of a constructive discharge claim under state law. A constructive discharge would also constitute an adverse action that could form the basis of a retaliation claim. A jury could conclude from the evidence that Defendant terminated her on May 19 in order to avoid an actionable constructive discharge claim, thereby culminating the retaliation that began with her permanent replacement.

Plaintiff presents sufficient evidence on summary judgment for a jury to find that she was fired in retaliation for her EEOC complaint.

## II. Plaintiff's Family Medical Leave Act Claim

### A. Procedural Background

In addition to the Title VII claims, Count VII of Plaintiff's Second (and Proposed Third) Amended Complaint alleges a violation of the Family Medical Leave Act ("FMLA"). On July 10, 2001, the Court

issued an Order ("July 10 Order") regarding Plaintiff's FMLA claims. The Court found that a genuine issue of material fact existed on the question of whether Plaintiff was an "eligible employee" under the FMLA, denying Defendant's motion for summary judgment on that issue. The Court then denied without prejudice both parties' motions for summary judgment on the remaining FMLA issues, with leave to reinstate after the Supreme Court's decision in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). Following the issuance of that decision, Defendant filed a Supplemental and Superceding Motion for Summary Judgment on Plaintiff's FMLA Claims (Doc. # 165), and Plaintiff filed Renewed Motion for Summary Judgment on Count VII of Plaintiff's Second Amended Complaint (Doc. # 167). For the reasons set forth, Defendant's Motion will be granted, and Plaintiff's Motion will be denied.

### B. Factual Background

The following facts are summarized from the Court's July 10 Order, and are stated as viewed in the light most favorable to the Plaintiff.[19] In July 1997, while she was employed as Regional Manager of Defendant's Phoenix Office, Plaintiff learned that she was pregnant with triplets. DSOF ¶ 1, PCSOF ¶ 1. Due to complications associated with pregnancy, Plaintiff was placed on part-time short-term disability leave on July 22, 1997, then moved to full-time short-term disability leave on October 1, 1997. DSOF ¶ 2, PCSOF ¶ 2. Plaintiff was placed on bed rest because of her "high risk pregnancy"

---

19. The facts in this section are taken from the Court's July 10 Order, as well as Compuware's Statement of Facts in Support of its Superceding Motion for Summary Judgment on Plaintiff's FMLA Claims [Doc. # 166]

("DSOF"), and from Plaintiff's Controverting and Supplemental Statement of Facts Submitted in Opposition to the same [Doc. # 179] ("PCSOF").

on October 20, 1997. PSOF ¶ 9, DCSOF ¶ 9.

On November 24, 1997, at the latest, Plaintiff began her long-term disability leave. DSOF ¶ 5, PCSOF ¶ 5. At that time, Defendant maintained a policy or practice of running FMLA leave and long-term disability leave concurrently. DSOF ¶¶ 6, 7, PCSOF ¶¶ 6, 7. Plaintiff was notified on September 26, 1997, that she "should be aware that time off under the Long–Term Disability plan will be counted toward any time which may be available to [her] under the Family and Medical Leave Act." DSOF ¶ 3, PCSOF ¶ 3, Bonner Sept. 26, 1997 Letter, Exh. 1 to SOF [Doc. # 95].

On February 6, 1998, Plaintiff gave birth to triplets. DSOF ¶ 13, PCSOF ¶ 13. Plaintiff did not return to work or attempt to return to work on February 16, 1998, the latest date of her coverage under the FMLA 12–week leave requirement, assuming the FMLA leave started running on November 24, 1997. DSOF ¶¶ 14, 15, PCSOF ¶¶ 14, 15. On March 5, 1998, Defendant sent Plaintiff a Memorandum ("March 5 Memo") contradicting its previous position on leave, informing Plaintiff that her FMLA leave had begun on February 16, 1998, and would run until May 4, 1998. DSOF ¶ 16, PCSOF ¶ 16, Bonner March 5, 1998 Memorandum, Exh. 5 to SOF [Doc. # 95].[20] This March 5 Memo forms the basis of Plaintiff's FMLA claims.

During the time she was on leave, Defendant filled Plaintiff's position as Regional Manager. On April 23, 1998, Sleiter sent Plaintiff a letter informing her that her position had been filled out of "business necessity," but that, "under the provisions of the [FMLA], Compuware is responsible for providing you with an equivalent position upon your return from FMLA leave." DSOF ¶ 17, PCSOF ¶ 17. Defendant offered Plaintiff a number of other positions, none of them in Phoenix, which Plaintiff did not believe to be equivalent to her old position.[21] (*Id.*) After the series of disputes recounted above, Plaintiff's employment was terminated effective May 15, 1998. DSOF ¶ 20, PCSOF ¶ 20.

## C. Analysis

### 1. Cause of Action Under the FMLA

Plaintiff asserts a claim pursuant to 29 U.S.C. § 2612(a), which provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period," among other reasons, because of the birth of a child. 29 U.S.C. § 2612(a). Title 29 U.S.C. § 2614(a)(1) provides:

[A]ny eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave— (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

---

**20.** The reason for the policy change is not entirely clear, though the employee who authored the March letter has indicated that "[d]uring this period we were revising our FMLA policy and the decision was made through a conversation I had with my manager to start her FMLA clock on this date, the birth of her children." Bonner Depo at 56. For the purposes of resolving this motion, the employer's motivation in offering this later contradictory information is irrelevant.

**21.** Plaintiff and Defendant provide competing versions of the circumstances surrounding the filling of Plaintiff's prior position of Regional Manager and the sufficiency of Defendant's offer of a replacement position. As the Court noted in the July 10 Order, these "ancillary issues" become moot if Plaintiff fails to show Defendant denied her rights under her 12–week FMLA leave. Order at 9, n. 11. Because Plaintiff cannot prove the threshold matter, these ancillary issues are not considered by the Court.

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a)(1). According to 29 U.S.C. § 2615(a)(1), "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

Plaintiff claims that she was not restored to an equivalent position after return from FMLA leave. Plaintiff cites 29 C.F.R. § 825.214(a), which provides:

On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment. An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.

29 C.F.R. §§ 825.214(a) and (b). An equivalent position is "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." 29 C.F.R. § 825.215(a). Further, the employee "must be reinstated to the same or a geographically proximate worksite (i.e., one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed." 29 C.F.R. § 825.215(e)(1).

To maintain a cause of action under the FMLA, however, Plaintiff must show that she was still protected by the 12–week leave period mandated by the FMLA. When an employee takes more than twelve weeks of leave, some portion of that leave may be designated as FMLA leave. "[A]n employer may require the employee, to substitute any of the accrued paid vacation leave, personal leave, or family leave of the employee for leave ... for any part of the 12–week period of [FMLA] leave[.]" 29 U.S.C. § 2612(d)(2)(A).

██ Because Plaintiff took longer than 12 weeks leave, she is only entitled to an equivalent position under the FMLA if she was prepared to return to work during a time designated as FMLA leave. Defendant claims to designate a period of time running, at the latest, from November 24, 1997 to February 16, 1998, while Plaintiff proposes to designate a period of time running from February 16, 1998 to May 6, 1998. Plaintiff was on long-term disability leave during both those time periods, and Defendant, at different times, gave her notice that both time periods would function as her FMLA leave. Because the sufficiency of Defendant's notice is at issue, the appropriate time period is dependent on compliance with the notice requirements in the statute.

The FMLA does not impose any specific requirements for the type or timing of notification an employer must provide to an employee when designating FMLA leave. However, the Labor Department has issued more particular notice requirements, notably 29 C.F.R. § 825.208, which provides: "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA-qualifying, and to give notice of the designation to the employee as provided in this section." 29 C.F.R. § 825.208(a). "If the employer has the requisite knowledge to make a determination that the paid leave is for an FMLA reason at the time the employee ... gives notice of the need for leave ..., the employer may not designate leave as

FMLA leave retroactively, and may designate only prospectively as of the date of notification to the employee of the designation." 29 C.F.R. § 825.208(c). Thus, if an employer fails to properly notify an employee that she is using her FMLA leave, "none of the absence preceding the notice to the employee of the designation may be counted against the employee's 12–week FMLA leave entitlement." *Id.*

As the July 10 Order noted, courts have split on whether the notice requirements of § 825.208 are valid or in contravention of the FMLA statutory language. July 10 Order at 12–13; *see, e.g. McGregor v. Autozone, Inc.,* 180 F.3d 1305, 1308 (11th Cir.1999) (not enforcing § 825.208); *Plant v. Morton Int'l, Inc.,* 212 F.3d 929, 935 (6th Cir.2000) (upholding enforcement of § 825.208); *Nolan v. Hypercom Manufacturing Resources,* 2001 WL 378235 (D.Ariz.2001) (Broomfield, J.) (holding § 825.208 not enforceable). *Ragsdale* did not resolve whether the notice requirements of § 825.208 itself were valid, *see* 122 S.Ct. at 1161, but did provide guidance on how courts should enforce notice violations under the FMLA.

### 2. Effect of *Ragsdale* on Plaintiff's Claims

In *Ragsdale,* the Supreme Court described the "FMLA's most fundamental substantive guarantee" as "the employee's entitlement to a total of 12 workweeks of leave during any 12–month period" *Ragsdale,* 122 S.Ct. at 1163-64 (citations omitted). The Court struck down a Labor Department regulation, 29 C.F.R. § 825.700(a), which mandated that, "If an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." The result of § 825.700(a) was that employers were categorically required

to give an employee an additional 12 weeks of FMLA leave if the employer failed to comply with the notice regulations. This categorical penalty for a notice violation "subvert[ed] the careful balance [between employers' and employees' interests], for it gives certain employees a right to more than the 12 weeks of FMLA-compliant leave in a given 1–year period." *Ragsdale,* 122 S.Ct. at 1164. The Court noted that the effect of § 825.700(a) was to penalize employers who give more generous benefits than the FMLA requires, because only generous employers risk the burden of an additional 12 weeks if they improperly designate FMLA time during their own longer leave policies. *Id.* at 1164–65.

In striking down the categorical regulation, the Supreme Court left open the possibility that employees could recover for notice violations on a "case-by-case" basis. *Ragsdale,* 122 S.Ct. at 1162. The Court indicated that actual harm to an employee was necessary to state a claim for violations of the notice provision, disapproving of a "penalty [ ] unconnected to any prejudice the employee might have suffered from the employer's lapse." *Id.* at 1161. The Court clarified:

> The purpose of the cause of action is to permit a court to inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions. To determine whether damages and equitable relief are appropriate under the FMLA, the judge and jury must ask what steps the employee would have taken had circumstances been different considering, for example, when the employee would have returned to work after taking leave.

*Id.* at 1162.[22]

Following *Ragsdale,* at least one District Court has held that a plaintiff must show

---

**22.** *Ragsdale* gave many more indications that

the employee must show prejudice to prevail

detrimental reliance and prejudice to prevail on a notice violation under the FMLA. In *Summers v. Middleton & Reutlinger, P.S.C.*, 214 F.Supp.2d 751 (W.D.Ky.2002), the plaintiff sued the defendant for retroactively designating her leave as FMLA leave. However, the plaintiff conceded that she would not have been ready to return to work at the end of the twelve-week FMLA period. The Court granted summary judgment based on *Ragsdale*, holding that the plaintiff could not show prejudicial effect from the employer's violations of the notice provision. The Court held that the "plaintiff cannot merely rely on the fact that defendant designated her FMLA leave retrospectively, she must demonstrate that her rights under the FMLA were violated and she was harmed as a result." *Id.* at 757. Since the plaintiff was not able to return to work at the end of the twelve-week FMLA period, she could not show prejudice. *Id.* at 757–58.

In fact, courts have generally regarded an FMLA plaintiff's inability to return to work at the end of a twelve-week period as proof that the plaintiff did not detrimentally rely on any misrepresentations under the FMLA's notice provisions. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155, 161–2 (2nd Cir.1999) ("Sarno's right to reinstatement could not have been impeded or affected by the lack of notice because his leave was caused by a serious health condition that made him unable to perform the functions of his position, and it is undisputed that that inability continued for some two months after the end of his 12–week FMLA leave period. Any lack of notice of the statutory 12–week limitation on FMLA leave could not

rationally be found to have impeded Sarno's return to work.") (citations omitted). This situation was also present in *Ragsdale*, and the Court indicated that the plaintiff was not prejudiced by the notice violation if otherwise unable to return to work. *See Ragsdale*, 122 S.Ct. at 1162. ("Ragsdale has not shown that she would have taken less leave or intermittent leave if she had received the required notice. . . . Even if Wolverine had complied with the notice regulations, Ragsdale still would have taken the entire 30–week absence.").

 In order to prevail on her FMLA claim after *Ragsdale*, Plaintiff must show that she detrimentally relied on and was prejudiced by Defendant's improper notice, such that "the employee would have exercised his or her FMLA rights in the absence of the employer's actions." *Ragsdale*, 122 S.Ct. at 1162, *see also Summers*, 214 F.Supp.2d at 757. Plaintiff emphasizes that Defendant did not just fail to give adequate notice, but rather affirmatively misrepresented the designation of Plaintiff's FMLA leave in the March 5 Memo to her. Plaintiff contends that this did indeed cause "a real impairment of her rights under the FMLA," further arguing that "there is a great difference between failing to give individualized notice that an employee's FMLA leave is running, and actually giving the employee individualized notice that the employee's FMLA leave will end on a specified date." Pl's Opposition at 3. Nevertheless, Plaintiff still bears the burden, under *Ragsdale*, of showing some prejudicial impairment of rights under the FMLA from the affirmative misrepresentation.

on a claim of a notice violation under the FMLA, noting that " § 2617 provides no relief unless the employee has been prejudiced by the violation. . . . The remedy is tailored to the harm suffered." 122 S.Ct. at 1161. Further, § 825.700(a) was "invalid because it . . . relieves employees of the burden of proving any

real impairment of their rights and resulting prejudice. . . . By mandating [relief] absent a showing of consequential harm, the regulation worked an end run around important limitations of the statute's remedial scheme." 122 S.Ct. at 1162.

Plaintiff provides no evidence that she was prejudiced by Defendant's March 5 designation. Initially, Defendant represented to Plaintiff on September 26, 1997 that her FMLA leave would run concurrently with her long-term disability, which began, at the latest, on November 24, 1997. Therefore, Plaintiff was protected by the twelve-week leave provisions of the FMLA until February 16, 1998, ten days after she gave birth. When Plaintiff did not return to work on that day, she was no longer protected by the terms of the FMLA, and was relying on benefits under Defendant's voluntary leave plan.[23] On March 5, 1998, after the FMLA 12–week period had expired, Defendant sent Plaintiff a Memorandum informing her that her FMLA leave would not expire until May 6, 1998. Even if Plaintiff relied on the March 5 Memo, that reliance was not detrimental to her FMLA rights. By March, Plaintiff *was no longer protected by the provisions of the FMLA*. She lost her FMLA protections on February 16, *before* she was told by Defendant that she could remain on FMLA leave.

Therefore, Plaintiff fully exercised her FMLA rights notwithstanding Defendant's actions. Plaintiff received a windfall as a consequence of Defendant's error, and Defendant's representation that the additional leave time was mandated by the FMLA does not create a cause of action for Plaintiff under the statute. Plaintiff's FMLA rights must be prejudiced to state a claim. Because Plaintiff did not return to work on February 16, 1998, or provide evidence that she would have returned on that date absent Defendant's actions, there are no genuine issues of material fact regarding whether Plaintiff's rights under the FMLA were prejudiced by Defendant's actions.

### 3. Equitable Estoppel

To save her FMLA claim, Plaintiff urges the Court to adopt a theory of equitable estoppel, and hold Defendant to the representations within the March 5 Memo that Plaintiff's FMLA leave would run until May. Plaintiff argues that Defendant should be estopped from asserting that her FMLA leave ended on February 14, 1998, because Defendant later made the representation that her leave ended on May 4. Equitable estoppel is not a new cause of action, but rather, "a judicial doctrine of equity which operates apart from any underlying statutory scheme. If all the elements of equitable estoppel are met, an employer may be estopped from challenging an employee's eligibility as a result of the employer's misconduct.... " *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706 (2d Cir.2001). Plaintiff argues that Defendant would have no adequate defense to her FMLA claim if it was equitably estopped from asserting that Plaintiff's FMLA leave ended on February 16.

The Ninth Circuit has not applied equitable estoppel under the FMLA, but has recognized some situations were equitable estoppel can be applied under federal statutes. *See Naton v. Bank of California*, 649 F.2d 691 (9th Cir.1981) (applying equitable estoppel under the ADEA); *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176–77 (9th Cir.2000) (discussing

---

**23.** Plaintiff tries to create a triable issue of fact by asserting that she was prepared to return to work sometime before May 15, 1998. Pl's Opposition at 5. While this might be true, Plaintiff's assertion is misguided, since May 15 is not the relevant date. The evidence needed to show a triable issue of fact is that Plaintiff would have attempted to return to work on February 16. However, at that time, even viewing the facts in Plaintiff's favor, she had been most recently informed that her FMLA leave would expire on Feb. 16, ten days after she gave birth. Even given that information, she has conceded that she did not attempt to return to work on Feb. 16.

equitable estoppel under the ADA). The Ninth Circuit has held that a "finding of estoppel must rest on consideration of several factors," including (1) "a showing of the plaintiff's actual and reasonable reliance on the defendant's conduct or representation," (2) "evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct," and (3) "the extent to which the purposes of the [time] period have been satisfied." *Naton,* 649 F.2d at 696. Given the Supreme Court's holding in *Ragsdale* that "the FMLA's most fundamental substantive guarantee" is "the employee's entitlement to a total of 12 workweeks," 122 S.Ct. at 1163–64, it is unclear whether the purposes of the statute would be advanced by applying equitable estoppel to extend an employer's 12–week obligation. However, even if equitable estoppel could be applied, Plaintiff cannot show detrimental reliance.

▮ Cases which have applied equitable estoppel under the FMLA have required that the employee show she detrimentally relied on the employer's misrepresentation. In *Woodford v. Community Action of Greene County, Inc.,* 268 F.3d 51, 57 (2d Cir.2001), the Second Circuit held that "future employees who rely to their detriment upon the assurance of their employer that they qualify for leave under the FMLA may have recourse to the doctrine of equitable estoppel...." *See also Dormeyer v. Comerica Bank–Illinois,* 223 F.3d 579, 582 (7th Cir.2000) (Under FMLA, "an

employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of entitlement to family leave."). In *Woodford,* the employee relied on the employer's representation that she was eligible for FMLA leave, only to be terminated before she returned. The Court held that the employer could be equitably estopped from asserting the employee's FMLA ineligibility since the employee relied on its prior representation to the contrary.[24] *See also Kosakow,* 274 F.3d at 722–24 (where employee claimed she detrimentally relied on defendant's misrepresentations of number of hours necessary to be eligible for FMLA leave and employer could have worked necessary hours, employer could be estopped from claiming employee was ineligible under FMLA).

Plaintiff cannot establish the elements of equitable estoppel, however, because she did not rely on Defendant's March 5 representations to her detriment. After February 16, Plaintiff was ineligible for FMLA benefits because she had already used her twelve weeks, *not because* she relied on Defendant's FMLA representations, which were not made until March 5. Even if Plaintiff relied on the March 5 Memo, the reliance was not to the detriment of her FMLA rights, which had been previously exercised and expired. Plaintiff's closest

---

**24.** Beyond the equitable estoppel holding, *Woodford* does not support Plaintiff's case. There, the Second Circuit struck down a blanket rule, 29 C.F.R. § 825.110(d), that, much like the regulation struck down in *Ragsdale,* categorically penalized the employer for any misrepresentation of the employee's FMLA eligibility. The regulation provides, in pertinent part, "If the employer confirms eligibili-

ty at the time notice for leave is received, the employer may not subsequently challenge the employee's eligibility." The Court held that it "impermissibly expands the scope of eligibility" by mandating that some employees get FMLA benefits without actually being eligible. 268 F.3d at 57. Likewise, Plaintiff is trying to claim FMLA benefits to which she is not entitled, absent a showing of detrimental reliance.

authority on point, *Blankenship v. Buchanan General Hosp.*, 999 F.Supp. 832 (W.D.Va.1998), is inapposite and illustrates the frailty of Plaintiff's position. In *Blankenship*, the Court applied equitable estoppel where the employee alleged that the defendant employer misrepresented her return date under the FMLA, then fired her a week before that date when she failed to return to work, even though the employee *could have returned to work on that earlier date*. In contrast, Plaintiff concedes that she did not return to work on February 16, and Defendant's misrepresentation about her later FMLA return date was not made until nearly a month later, and thus could not have affected her FMLA rights. Because Plaintiff cannot show detrimental reliance, Defendant is not equitably estopped from arguing that Plaintiff's leave ended on or before February 16, 1998, and Plaintiff's FMLA claim must be dismissed.[25]

### III. Motion to Amend to Add Promissory Estoppel Claim

#### A. Plaintiff's Proposed Third Amended Complaint

Plaintiff has moved to add a new claim for promissory estoppel based upon Defendant's representations to her in the March 5 Memo. As taken from Plaintiff's Proposed Third Amended Complaint ("PTAC"), Plaintiff alleges that Bonner made representations to her that she was on approved FMLA leave until May 4, 1998. PTAC ¶ 38. Further, Bonner told her that "she would be able to return to her same position as Regional Manager or an equivalent position in accordance with the requirements of the FMLA and regulations promulgated thereunder." *Id.* Second, "Defendant should have reasonably foreseen that Plaintiff would rely [on] the aforementioned promises of Compuware of planning her post-partem maternity leave and her decision not to return to work until after May 4, 1998." PTAC ¶ 39. Third, Plaintiff relied on this representation to chose not to return to work until after May 4, 1998. PTAC ¶ 40. Plaintiff indicates that this reliance contributed to the circumstances of her termination. Thus, she asks to recover compensation and benefits commensurate with the promises that Defendant made concerning an equivalent position. PTAC ¶ 41.

#### B. Legal Standard on Motion to Amend

Plaintiff has moved to amend under Rule 15, and Defendant has responded based on the Rule 15 standard. However, because a Rule 16 scheduling order has been issued, Plaintiff should properly move to modify the scheduling order under Rule 16. Fed.R.Civ.P. 15(a) allows for amendments by leave of court despite the lack of written consent from the adverse party. While the district court maintains the discretion to decide whether to grant or deny a motion to amend, the Rule specifies that such "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *United States v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir.2001) ("A district

---

**25.** At oral argument, Plaintiff also cited *Duty v. Norton–Alcoa Proppants*, 293 F.3d 481 (8th Cir.2002), in support of the equitable estoppel defense. In that case, the defendant employer also sent a misleading letter to the plaintiff employee indicating that his FMLA time remained, though after his 12 week FMLA period had already expired. The Eighth Circuit did not explain in detail how this belated representation could have affected the plaintiff's expired FMLA rights. *See Duty,* 293 F.3d at 494. However, the Court was merely reviewing the District Court's ruling for an abuse of discretion, and therefore deferred to the District Court's equitable conclusions regarding the factual situation. *Id.*

court's discretion to deny leave to amend ... is not absolute."); *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1472 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 699, 98 L.Ed.2d 650 (1988). "In exercising its discretion[,] ... 'a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities.... Thus, 'Rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality.'" *Eldridge v. Block,* 832 F.2d 1132, 1135 (9th Cir.1987) (citations omitted); *Morongo Band of Mission Indians v. Rose,* 893 F.2d 1074, 1079 (9th Cir.1990) (stating that leave to amend is generally allowed with "extraordinary liberality").

■ However, some limitations exist on this extremely liberal policy favoring amendments. The Supreme Court holds that motions to amend may be denied for the following reasons: (1) undue delay; (2) bad faith or dilatory motives on the part of the movant; (3) repeated failure to cure deficiencies by previous amendments; (4) undue prejudice to the opposing party; or (5) futility of the proposed amendment. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see SmithKline Beecham,* 245 F.3d at 1052; *Owens v. Kaiser Foundation Health Plan, Inc.,* 244 F.3d 708, 712 (9th Cir.2001); *Texaco, Inc. v. Ponsoldt,* 939 F.2d 794, 798 (9th Cir.1991). "Generally, this determination should be performed with all inferences in favor of granting the motion." *Griggs v. Pace Am. Group, Inc.,* 170 F.3d 877, 880 (9th Cir.1999) (citing *DCD Programs, Ltd. v. Leighton,* 833 F.2d 183, 186 (9th Cir.1987)). Significantly, "[t]he party opposing amendments bears the burden of showing prejudice," futility, or one of the other permissible reasons for denying a motion to amend. *DCD Programs, Ltd.,* 833 F.2d at 187; *see Richardson v. United States,* 841 F.2d 993, 999 (9th Cir.1988)

(stating that leave to amend should be freely given unless opposing party makes "an affirmative showing of either prejudice or bad faith"). These factors are not equally important; the possibility of delay alone cannot justify denial of a motion to amend. *DCD Programs, Ltd.,* 833 F.2d at 186. However, futility of the amendment alone provides sufficient grounds to deny an amendment. *Bonin v. Calderon,* 59 F.3d 815, 845 (9th Cir.1995), cert. denied, 516 U.S. 1051, 116 S.Ct. 718, 133 L.Ed.2d 671 (1996).

The standard for granting amendments changes and becomes progressively more difficult to meet as litigation proceeds toward trial. Rule 16(b) provides that "[a pretrial] schedule shall not be modified except by leave of the judge or a magistrate when authorized by district court rule upon a showing of good cause." Fed. R.Civ.P. 16(b).

Unlike Rule 15's liberal policy which focuses on the five factors listed above,

> Rule 16(b)'s "good cause" standard primarily considers the diligence of the party seeking the amendment. The district court may modify the pretrial schedule "if it cannot reasonable be met despite the diligence of the party seeking the extension." Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir.1992) (citations omitted) (quoting Fed.R.Civ.P. 16 advisory committee's notes (1983 amendment)). If a party fails to either move to amend or to

join additional parties within the proper time period listed in a scheduling order, the Court uses the Rule 16 standard to determine if it should grant the motion instead of the Rule 15 standard.

## C. Futility

"A district court does not err in denying leave to amend where the amendment would be futile ... or would be subject to dismissal." *Saul v. United States*, 928 F.2d 829, 843 (9th Cir.1991) (citations omitted); *see Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.1988) ("A motion for leave to amend may be denied if it appears to be futile or legally insufficient.") (citation omitted). "However, a proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Miller*, 845 F.2d at 214; *see Foman*, 371 U.S. at 182, 83 S.Ct. 227 (stating that "[i]f the underlying facts or circumstances relied upon by a [movant] may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits"); *DCD Programs*, 833 F.2d at 186 (stating that "a motion to make an 'amendment is to be liberally granted where from the underlying facts or circumstances, the plaintiff may be able to state a claim' ") (quoting *McCartin v. Norton*, 674 F.2d 1317, 1321 (9th Cir.1982)).

■ The standard of review is akin to that undertaken by a court in determining the sufficiency of a pleading challenged in a Rule 12(b)(6) motion to dismiss. *Miller*, 845 F.2d at 214. Under this standard, a court may not deny a motion to amend for futility "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Barnett v. Centoni*, 31 F.3d 813, 813 (9th Cir.1994) (citing *Buckey v. Los Angeles*, 957 F.2d 652, 654 (9th Cir. 1992)). Though, " 'it may appear on the face of the pleadings that a recovery is

very remote and unlikely[,] ... that is not the test.' " *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). " 'The issue is not whether the plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Id.*

### (1) Preemption

■ Defendant argues that Plaintiff's promissory estoppel claim is futile because it is preempted by the remedial scheme under the FMLA. In support, Defendant cites *Cavin v. Honda of America Mfg., Inc.*, 138 F.Supp.2d 987, 993 (S.D.Ohio 2001), which interpreted the FMLA to mandate that a state law claim is preempted when it is "a claim which is based on the rights guaranteed by the FMLA but which circumvents and conflicts with enforcement provisions and remedies set forth in the FMLA." In other words, "the remedies set forth in the FMLA are intended to be the exclusive remedies for violations of its provisions." *Id. See also Desrochers v. Hilton Hotels Corp.*, 28 F.Supp.2d 693, 695 (D.Mass.1998) ("the comprehensive detailed enforcement provisions of the FMLA show Congress' intention that the specific remedies set forth in Section 2617 of the FMLA are the exclusive remedies for the violations of the FMLA").

The Court need not determine the preemptive scope of the FMLA, because Plaintiff's promissory estoppel claim would not be preempted even under *Cavin*. Plaintiff's promissory estoppel claim is not that her rights under the FMLA were violated, but that Compuware's promises to her (couched in terms of FMLA requirements) resulted in detrimental reliance. *See Cavin*, 138 F.Supp.2d at 993 (claim founded "solely on a violation of the

FMLA" is preempted) Also, other courts have allowed state law promissory estoppel claims related to promises of FMLA benefits to go forward. *See, e.g. Bala v. Jacobson*, 2001 WL 1543503, *9–*11 (E.D.Mich. 2001) (allowing promissory estoppel claim). Plaintiff's claim is not preempted, and thus not futile in this regard.

### (2) *Limitation of Damages under Arizona Law*

However, Plaintiff's cause of action is futile in that it does not allege any damages that are recoverable under Arizona law. Plaintiff is limited to recovering reliance damages for her promissory estoppel claim related to the promise of FMLA benefits. In her Proposed Third Amended Complaint, Plaintiff seeks "to recover compensation and benefits commensurate with that which she would have received had the promises made to her by Compuware been fulfilled." (PTAC ¶ 41). Under Arizona law, the Court may limit recovery to reliance damages rather than the full enforcement of a promise.

Arizona courts follow the *Restatement (Second) of Contracts* in defining causes of action under promissory estoppel. *See Schade v. Diethrich*, 158 Ariz. 1, 11 760 P.2d 1050, 1060 (1988). The *Restatement* § 90 (1981) provides that, "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." However, affirmative promissory estoppel claims are not particularly favored in Arizona. As the Arizona Supreme Court has stated:

> Part of our reluctance to expand the applicability of Restatement § 90 to cases other than those in which promissory estoppel forms a substitute for consideration, thus permitting enforcement of noncontractual promises, is that the

theory provides little in the way of legal rules for allowing or limiting recovery. The concept of doing what 'justice requires' varies from case to case and from the perception of one judge to that of another. While this is both desirable and unavoidable in considering facts, it is hardly a sound method for constructing legal standards generally applicable to the facts once they are determined.

*Schade*, 158 Ariz. at 11, 760 P.2d at 1060.

The extent of relief under a promissory estoppel claim may be more limited than the recovery under a contract cause of action. "[R]elief may sometimes be limited to restitution or to damages or specific relief measured by the extent of the promisee's reliance rather than the terms of the promise." *AROK Contruction Co. v. Indian Construction Servs.*, 174 Ariz. 291, 300, 848 P.2d 870, 879 (App.1993) (quoting *Restatement (Second) of Contracts* § 90(1), comment d). The remedy may be limited "as justice requires." *Id. See, e.g., Kajima/Ray Wilson v. Los Angeles County Metro. Trans. Auth.*, 23 Cal.4th 305, 96 Cal.Rptr.2d 747, 1 P.3d 63 (2000) (limiting promissory estoppel claim to reliance damages in context of suit against public entity).

The extent of "what justice requires" is limited in Plaintiff's claim. Under federal law, Plaintiff is not entitled to an additional twelve weeks of leave, nor is she entitled to return to an equivalent position after those twelve weeks. In this case, Plaintiff is requesting that the Court do more than merely enforce the twelve extra weeks of leave (which she indeed received), and award her a right to return to an equivalent position commensurate with that defined by federal law. Plaintiff's requested remedy is drawn directly from federal law, even though Plaintiff is no longer entitled to protections under that law. In fact, if the Court were to allow this remedy, the Court would then have to *interpret federal*

*law* under the FMLA (on the definition of an "equivalent position") to determine whether Defendant fulfilled the conditions of a *non-contractual state law promise.* The technical merits of the failed federal claim would be essentially re-litigated in the guise of a state law claim. Given these circumstances, the Court does not find that "justice requires" a full remedy of reinstatement. Moreover, Plaintiff is not left without a remedy, as she can be fully compensated for any reliance damages.

However, Plaintiff's Proposed Third Amended Complaint, while stating that she detrimentally relied on Defendant's promise, does not set forth any legal cognizable detriment she incurred as a result of that reliance. Assuming all facts in Plaintiff's favor, the measure of reliance damages is related to the costs incurred in expectation she could return to her former job, not damages as if she had received a similar job. On the face of the Third Amended Complaint, Plaintiff has alleged only that she is entitled to the benefits of her former job or an equivalent position, not damages in reliance upon the promise of a job. Confronted with this reasoning at oral argument, Plaintiff's counsel clarified that the extent of the relief requested was "the benefit of what was promised to her; either that same job or an equivalent job." [26] Transcript at 80. Plaintiff has not alleged any damages that the Court can award under Arizona law. Therefore, granting the motion to amend would be futile, because Plaintiff has not alleged that she suffered any reliance damages.

## CONCLUSION

In conclusion, Defendant's motion for summary judgment will be granted in part

and denied in part. Summary judgment will be granted for Defendant on the issues of (1) the increase in the regional sales quota for the Phoenix Region as discrimination; (2) the increase in the regional sales quota for the Phoenix Region as retaliation; and (3) the cap on bonus compensation in FY98 as retaliation. However, summary judgment will be denied on the issues of (1) the calculation of Farina's FY97 bonus award as discrimination; (2) the permanent replacement of Farina as Regional Manager and alleged demotion to position of Sales Manager as retaliation; and (3) the termination of Farina's employment as retaliation. Genuine issues of material fact remain on these final three issues. In addition, summary judgment will be granted for Defendant on Plaintiff's FMLA claim, and Plaintiff's Motion for Leave to File Third Amended Complaint will be denied.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment on Title VII claims [Doc. # 143] is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment on Plaintiff's FMLA Claims [Doc. # 165] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on Count VII of Plaintiff's Second Amended Complaint [Doc. # 167] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Third Amended Complaint [Doc. # 168] is **DENIED**.

---

**26.** At oral argument, Plaintiff did try to frame the job issue in terms of reliance damages, arguing that "[b]ecause she relied on the promise that she should not have to return to work until a later date, she was terminated." Transcript at 81. However, Plaintiff has made no allegation that she was terminated for not returning to work in reliance on Defendant's promises of leave. Indeed, she was still on approved (non-FMLA) leave when her alleged termination occurred.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Defendant's 17th Supplemental Disclosure Statement and Motion in Limine [Doc. # 164] is **DENIED WITHOUT PREJUDICE.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Certain Portions of Defendant's Statement of Facts in Support of Compuware's Motion for Summary Judgment on Title VII Claims [Doc. # 157] is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that the parties are to prepare a Joint Proposed Pretrial Order by May 9, 2003, including motions *in limine*, a jointly proposed statement of the case, and jointly proposed voir dire questions. The parties shall submit either individually five (5) additional voir dire questions or collectively ten (10) jointly proposed voir dire questions. The parties are directed to the Court's website at www.azd.uscourts.gov (under "Judicial Officer Information") for copies of the forms. Responses to motions *in limine* are due on May 23, 2003. The Final Pretrial Conference will be held on July 11, 2003 at 1:30 p.m.